BARRACK, RODOS & BACINE
STEPHEN R. BASSER (121590)
sbasser@barrack.com
SAMUEL M. WARD (216562)
sward@barrack.com
600 West Broadway, Suite 900
San Diego, CA 92101
Telephone:   (619) 230-0800
Facsimile:   (619) 230-1874

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARALYN TADA, NAGORE MILES, BETHANY RISING  and JIYING SPENCER, individually and on behalf of all others similarly situated,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>QUALCOMM INCORPORATED,<br><br>　　　　　Defendant. | Case No.:<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE ANTITRUST LAWS, STATE UNFAIR COMPETITION LAWS, AND THE COMMON LAW OF UNJUST ENRICHMENT**<br><br>**JURY TRIAL DEMANDED** |

COMPLAINT

Plaintiffs by and through their duly undersigned attorneys, individually and on behalf of a class of all those similarly situated, bring this class action and allege as follows based on counsels' investigation and review, Plaintiffs' personal knowledge as to allegations personal to themselves, and as to all other allegations upon information and belief:

## I.    INTRODUCTION

1.    Plaintiffs bring this action against Defendant Qualcomm Incorporated ("Qualcomm") seeking damages and injunctive relief arising from its anticompetitive conduct in acquiring and maintaining a monopoly over the modem chipset (baseband processor) market, which conduct also includes, *inter alia*, abusing the intellectual property rights underlying that technology, and charging an excessive and unlawful royalty on cellular phones or devices incorporating such patents, with the result that each end-user purchaser pays an inflated price for each cellular phone or device.  Plaintiffs are purchasers of cellular telephones and other cellular devices utilizing baseband processors.

2.    By way of background, the components of a wireless network all use a shared communication "standard" in order to ensure compatibility. Standard setting organizations ("SSO") develop these standards. Participants in the SSOs own various patented technologies that are included in the operation of the standard. These patents are known as standard essential patents ("SEPs") because they must be licensed by companies that make products or services that use the standard.

3.    Companies invest tremendous amounts of money in the research and development of products and services that are based upon a standard. One significant consequence of such industry-wide investment is that they create a "lock-in" effect due to the fact that the company must use the agreed-upon standard in order to competitively sell its products and services in the market.  SEP owners can exploit this lock-in effect by demanding inflated royalties that include a premium from licensees.  A royalty rate that includes this premium is supracompetitive because it exceeds the royalty rate that a licensee would pay if the lock-in effect did not exist.  Standard setting organizations — SSOs — are keenly aware of this

COMPLAINT

1    problem, which, if abused, can greatly reduce or limit competition.  In order to establish a

2    safeguard against such abuse, SSOs require participants to agree to license their SEPs on fair,

3    reasonable, and non-discriminatory terms ("FRAND") as a condition of the inclusion of this

4    patented technology into the standard. By definition, a FRAND rate is equivalent to the

5    competitive royalty rate that would be negotiated between licensor and licensee and excludes

6    the supracompetitive premium that an SEP licensor could otherwise charge.  Moreover, an SSO

7    will generally design a standard to avoid using patents whose owners refuse to agree to license

8    them on FRAND terms.

9           4.      Qualcomm's baseband processors, which are an essential component of cellular

10   devices that enable cell phones and tablets to communicate with wireless networks, are designed

11   to work with specific wireless standards. There have been four generations of wireless

12   communications standards.  The two main types of second and third generation standards,

13   known as Code Division Multiple Access ("CDMA") and Global System for Mobile

14   Communications ("GSM"), are based on different types of technology. LTE is the main fourth

15   generation ("4G") standard. Qualcomm holds a number of SEPs related to CDMA technology

16   and has made written contractual commitments to offer SEPs on FRAND terms to all licensees.

17          5.      Qualcomm has had a monopoly in the CDMA baseband processor market since

18   at least 2008.  Since 2012, Qualcomm has held a monopoly in the LTE baseband processor

19   market.  In 2015, Qualcomm had an 83% share of the CDMA baseband processor market and a

20   69% share of the LTE baseband processor market.

21          6.      Qualcomm has maintained its monopoly over CDMA and LTE wireless standard

22   products by engaging in anticompetitive practices, including flatly refusing to license its SEPs

23   on FRAND terms to other baseband processor manufacturers. This refusal has violated

24   Qualcomm's contractual commitment to offer its patents on FRAND terms to all licensees.

25   Qualcomm's refusal is anticompetitive.   Indeed, as reported by the Korean Fair Trade

26   Commission ("KFTC"), Qualcomm's own internal documents show that its licensing practices

27   were explicitly designed to drive competitor manufacturers out of the market — a strategy that

28

COMPLAINT

has proven to be very effective.  Qualcomm's anticompetitive practices enabling it to successfully maintain a monopolistic position in the CDMA and LTE baseband processor markets have chased nine of the other 11 baseband processor manufacturers out of the market, even though the market has more than doubled in size.

7.    Qualcomm's anticompetitive conduct in furtherance of maintaining its monopoly over the CDMA and LTE baseband processor markets has enabled it to collect inflated, excessive royalties on its SEPs from cell phone and tablet manufacturers (original equipment manufacturer or "OEMs"). To this end, Qualcomm has established an anticompetitive "no chips no license" policy that requires OEMs to separately pay an artificially inflated royalty rate for Qualcomm's SEPs as a condition of purchasing Qualcomm's baseband processors.  For example, one OEM entity, Apple, has stated that it pays Qualcomm more patent royalties than it pays to **all** other patent holders on sales of its cellular devices even though those patent holders have far more intellectual property related to Apple's products. One study found that Qualcomm received royalties equivalent to 2% of global cell phone sales in 2013 and 2014, while four other comparable companies, each with similar portfolios of SEPs, only received between .2 to .4% of overall cell phone sales. Qualcomm currently demands a royalty rate of 3.25% on the wholesale price of LTE cell phones and tablets, even though the LTE standard is not based on Qualcomm's CDMA technology.  Qualcomm refuses to sell baseband processors to OEMs who will not pay Qualcomm's inflated royalty rates.  And Qualcomm has used the threat of a reduced supply of baseband processors to ensure that OEMs continue to pay Qualcomm's artificially inflated royalty rates on its SEPs.

8.    Qualcomm's "no chips no license" policy is unique and contrary to the practice deployed by other cell phone component manufacturers to include a license to their intellectual property rights with the sale of the component.  Its "no chips no license" policy also violates the established legal doctrine of patent exhaustion, which holds that the authorized sale of an article by a patent owner that substantially embodies the patent holder's patents exhausts the patent holder's rights in the article.  Furthermore, Qualcomm's "no chips no license" policy chills

COMPLAINT

OEMs from seeking a judicial determination of an appropriate FRAND rate on Qualcomm's SEPs because they cannot risk losing access to Qualcomm's baseband processors. Qualcomm demands and secures contractual provisions preventing OEM licensees from seeking a judicial determination of the FRAND rate, consequently defeating the important safeguard provided by judicial review.

9.      Qualcomm's anticompetitive conduct maintaining and abusing its monopoly also includes "royalty stacking," royalty "double-dipping" and demanding and receiving royalties on product features that are unrelated to its patents. Having "parlayed its pioneering role in cellular technology into a patent-licensing business that generates most of its profits, Qualcomm charges a royalty on nearly every smartphone made, whether or not the device uses its chips."[1] Qualcomm has admitted in its second quarter 2016 report on Form 10-Q filed on June 29, 2016 with the Securities and Exchange Commission that "royalties are generally based on a *percentage of the wholesale (i.e., licensees) selling price of complete license products*, net of certain permissible deductions (including transportation, insurance, packing costs and other items)." (Emphasis added)

10.     Qualcomm typically charges makers of 3G devices — and 3G-compatible 4G models — up to 5% of their products' wholesale price — around $20 on a $400 phone. Qualcomm's royalty rate is calculated based on the final wholesale price of a cell phone or tablet even though the final wholesale price is often dependent on completely unrelated features. Apple sells the iPhone 7 at several different price points based on the amount of memory that the device has. This is the only difference between the various models. However, Qualcomm receives more royalty revenue from the more expensive versions of the iPhone 7, even though its technology has nothing to do with the extra features that justify the higher retail price. This anticompetitive licensing practice disincentivizes OEMs from including technical features that would benefit consumers and constitutes a form of overcharge on consumers who are deprived

---

[1]      Don Clark, Qualcomm's main profit driver is under pressure, The WallStreet Journal, (http://www.wsj.com/articles/qualcomms-main-profit-driver-is-under-pressure-1428967051 (las visited February 13, 2017).

COMPLAINT

of valuable technical features in cell phones and tablets that would have been included but for Qualcomm's supracompetitive patent royalties.

11.    The direct culmination of Qualcomm's abusive monopoly and anticompetitive conduct enabling it to inflate prices for CDMA and LTE baseband processors is that its *overcharges are passed on to consumers*.

12.    Qualcomm's anticompetitive conduct has received worldwide condemnation. Government antitrust agencies have so far levied over $2 billion in fines on Qualcomm for its anticompetitive practices.  Multiple investigations are still pending.

13.    The KFTC fined Qualcomm $208 million in 2009 and $853 million in 2016 for Qualcomm's unfair licensing practices. The Chinese National Development & Reform Commission ("NDRC") fined Qualcomm $975 million in 2015 for its licensing practices and required Qualcomm to change the licensing terms that it offered for its SEPs. The Japanese Fair Trade Commission issued a cease and desist order against Qualcomm in 2009 for violating its FRAND obligations. The Taiwanese Fair Trade Commission announced an ongoing investigation into Qualcomm's licensing practices in December 2015.  In December 2015, the European Commission announced two statements of objection against Qualcomm for 1) paying Apple significant amounts to exclusively purchase baseband chipsets from Qualcomm, stifling competition in the market; and 2) pricing baseband processors below cost in order to hinder competition in the market.  Still, Qualcomm persisted in its highly profitable and unlawful conduct in relentless pursuit of maintaining its monopoly.

14.    Qualcomm has also actively worked to foil government investigations in order to maintain its monopoly.  For example, Qualcomm withheld approximately $1 billion in rebate payments from Apple as retaliation for Apple's cooperation with the 2016 KFTC investigation, offering to release these payments only if Apple submitted revised materials to the KFTC that asserted Qualcomm's position.

15.    Broadcom, Nokia, and Icera have each previously filed antitrust lawsuits against Qualcomm for its anticompetitive practices. On January 17, 2017, the Federal Trade

COMPLAINT

Commission ("FTC") filed a complaint in this Court against Qualcomm for its licensing practices. *Federal Trade Commission v. Qualcomm Inc.*, Case No. 17-cv-00220 (N.D. Cal., Jan. 17, 2017). The FTC stated that Qualcomm had unlawfully maintained a monopoly in baseband processors and that Qualcomm's actions had "raise[d] prices paid by consumers for cell phones and tablets."  Thereafter, Apple filed an antitrust action against Qualcomm in the Southern District of California arising from Qualcomm's anticompetitive practices. *Apple v. Qualcomm Incorporated*, Case No. 17-cv-00108 (S.D. Cal. Jan. 20, 2017).

16.     Plaintiffs — all consumers who purchased cellular phones and devices at prices that were inflated as a direct consequence of Qualcomm's unlawful, anticompetitive and monopolistic conduce and abuses — now seek redress and an end to its ongoing harm.

17.     Plaintiffs bring this action on behalf of themselves and all other similarly situated to recover for their injuries resulting from Qualcomm's violations of Section 1 and 2 of the Sherman Act, as well as violations of state antitrust and consumer protection laws.  Plaintiffs seek monetary damages, injunctive relief, and all other available remedies to which they are entitled on behalf of themselves and the class as a consequence of Qualcomm's unlawful conduct.

## II.   PARTIES

### A.   Plaintiffs

18.     Plaintiff Caralyn Tada ("Tada") is a resident of Los Angeles, California.  Ms. Tada purchased an Apple iPhone 5 and an iPhone 6 device for personal use and not for resale.

19.     Plaintiff Nagore Miles ("Miles") is a resident of Great Lakes, Illinois.  Ms. Miles purchased two Apple iPhone 6 Plus devices for personal use and not for resale.

20.     Plaintiff Bethany Rising ("Rising") is a resident of Davenport, Florida.  Ms. Rising purchased an Apple iPhone 6 and an iPhone 7 device for personal use and not for resale.

COMPLAINT

21.     Plaintiff Jiying Spencer ("Spencer") is a resident of Wesley Chapel, Florida.  Ms. Spencer purchased and Apple iPhone 6 Plus and two iPhone 7 Plus devices for personal use and not for resale.

**B.     Defendant**

22.     Defendant Qualcomm, is a global semiconductor company that designs and markets wireless telecommunications products and services.  A publicly traded, for-profit company, Qualcomm is a Delaware corporation with its principal place of business at 5775 Morehouse Drive, San Diego, California 92121.  Qualcomm has offices and employees in this District and regularly conducts business in this District.

23.     Qualcomm's principal businesses are the development, design, and sale of baseband processors and other semiconductor devices used in cell phones and other mobile consumer products (collectively, "handsets"), and the licensing of intellectual property related to cellular technology.  Qualcomm sells cellular baseband processors through a business unit called "Qualcomm CDMA Technologies" or "QCT."  Qualcomm licenses its intellectual property rights through a business unit called "Qualcomm Technology Licensing" or "QTL."  In the fiscal year ending in September 2016, Qualcomm reported that QCT had over $15.4 billion in revenues and earnings before taxes of $1.8 billion; and that QTL had over $7.6 billion in revenues and earnings before taxes of $6.5 billion.

24.     Qualcomm, as used herein, includes Qualcomm Technology Licensing ("QTL"); Qualcomm Technologies Inc. ("QTI"); and Qualcomm CDMA Technologies ("QCT"). QTI is wholly owned by Qualcomm, and QCT is operated by QTI and its subsidiaries.

**III.     JURISDICTION AND VENUE**

25.     The Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1337 (commerce and antitrust regulation), as this action arises under Section 2 of the Sherman Act, 15 U.S.C. § 2, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

7

COMPLAINT

26.     The Court has supplemental subject matter jurisdiction of the pendent state law claims under 28 U.S.C. § 1367.  Beyond the claims arising under federal statute, and even if there were no such claims asserted, the Court also has original subject matter jurisdiction over the claims arising under state law pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §1332(d), which explicitly provides for the original jurisdiction of the federal courts in any class action in which at least 100 members are in the proposed plaintiff class, any member of the plaintiff class is a citizen of a state that is different from the State of citizenship of any defendant, and the matter in controversy exceeds the sum of $5,000,000.00, exclusive of interest and costs.  Plaintiffs allege that there are at least 100 members in the proposed plaintiff class and that the matter in controversy is well in excess of $5,000,000.00 in the aggregate, exclusive of interest and costs.

27.     Venue is proper in this District pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22 and 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.  Venue is also proper in this District because Qualcomm transacts business and maintains facilities in this District and thus, is subject to personal jurisdiction in this District.

## IV.     INTRADISTRICT ASSIGNMENT

28.     Assignment to the San Jose Division is proper.  This action arises in Santa Clara County because a substantial part of the events giving rise to these claims occurred in Santa Clara County.  Qualcomm has offices in Santa Clara and San Jose.  Third parties that have information relevant to this action, including OEMs and some of Qualcomm's competitors, are located in or maintain their offices in Santa Clara County.

COMPLAINT

**V.    FACTUAL BACKGROUND**

    **A.    Cellular Standards and "SSOs"**

29.    Cellular network participants must follow a common set of standards which control how each part of a network communicates with the other parts. To that end, and for well over a decade, cellular service providers, baseband processor chipset manufacturers, and wireless device manufacturers have formed and joined (SSOs), which create and distribute common standards for all members to follow.  This is absolutely critical in creating a common technology platform that allows different network components to be delivered by multiple vendors, promotes interoperability of products, and incentivizes investments in infrastructure.

30.    Wireless standards have evolved in distinct generations.  The earliest cellular telephones and networks used first generation analog technology which was characterized by significant capacity limitations, poor data transfer, and low security.

31.    Further innovation and improvements ushered in so-called second generation ("2G") cellular technology, which implemented, among others, the GSM and CDMA standard. The 2G technology provided improved voice and data capacity, supported limited additional functions such as text and multimedia messages, and offered greater privacy and security at lower prices. Most cellular telephones today use (at a minimum) 2G technology and standards.

32.    Once again, innovation spurred advancements.  A third generation ("3G") cellular technology emerged.  The new 3G technology included the "Universal Mobile Telecommunications Service" ("UMTS") standard, which used "Wideband Code Division Multiple Access" ("WCDMA") technology allowing for even further increased data speed and capacity. These 2G and 3G technologies continue to be simultaneously deployed in products.

33.    LTE, sometimes referred to as a 4G cellular standard, is an upgrade to 3G/UTMS/WCDMA, providing an enhanced radio interface and all-IP networking technology. Thanks to constant research, development and ingenuity, the LTE standard has continually

9

COMPLAINT

advanced.  Progressive updates to the LTE standard have specified higher download speeds, carrier aggregation, and advanced power-saving features, among other functions.

34.    3G and 4G technology are often used in tandem through "multimode" chipsets that are compatible with both sets of standards.

35.    Baseband processor chipsets implement one or more of these standards.  A baseband processor performs the essential function of allowing cell phones and tablets to communicate with a wireless network.  A baseband processor must comply with the communications standard that a wireless network uses in order to provide functionality.

36.    Various carrier networks employ each of these major cellular standards. One family of standards used by carriers in the United States employs the GSM standard for 2G communications and the complementary UMTS standard for 3G communications. A rival family of standards used by U.S. carriers employs the CDMA standard and related technologies. The technologies in these two standards families each have advantages and disadvantages. Both families, however, have adopted the LTE standard, while requiring backwards compatibility to their respective 2G and 3G technologies.

37.    Chipsets designed for a particular wireless device must conform to the standards technology chosen for that network. For example, CDMA networks demand chipsets that conform to the CDMA standards, and only LTE-enabled chipsets can be used in devices designed for LTE networks. As a result, chipsets that comply with a given standard are not substitutes for, and have different price and demand characteristics from, chipsets that comply with other standards.

38.    Downstream consumers purchase cell phones that include chipsets configured to operate using the standards chosen for a particular network, inextricably tying those consumers to that standard.

39.    While adherence to and fair compliance with such common standards effects an increase in competition, product innovation, quality and, importantly, a wider array of products from which consumers may choose, an adopted system of uniform standards with respect to a

product requires usage of certain mandated technologies, which can, in effect, limit a compliant company's flexibility.  After a standard is adopted the participating company has to invest in various engineering parts, build cellular towers, and design handsets around particular capabilities that are standard compliant.  Once that standard is adopted and implemented, such a company cannot substitute alternative technologies in its products because those products will no longer work with any established network.  Since deviating from the uniform standard and substituting a different technology can become extremely costly, a company — indeed an entire industry — can and ultimately will become "locked-in" to a standard rather than absorb such abandonment costs.  As a consequence, safeguards are mandated to prevent the abuse of the standards by those seeking to secure or maintain monopoly power.

**B.    Licensing Technology on Fair, Reasonable and Nondiscriminatory Terms — The FRAND Safeguard**

40.    Telecommunications standards are complex.  Where standardized technologies are covered by patents — SEPs — companies that choose to implement a standard are often required to practice those patents.  Numerous different entities claim to own patents that read on some aspect of the standard.

41.    Absent adequate safeguards, companies in the wireless communications space are at the mercy of SEPs.  Such patent holders could demand inflated or discriminatory royalties from product companies who have no choice but to use the technology.  They could threaten to block a targeted company from implementing or practicing the standard, and demand and obtain royalty payments based not on the market value of their patents over alternative technologies, but on the costs and impossibility of switching away from standardized technology. This abuse is called "patent hold-up" and occurs "when the holder of a SEP demands excessive royalties after companies are locked into using a standard." *Ericsson, Inc. v. D-Link Sys., Inc.,* 773 F.3d 1201, 1209 (Fed. Cir. 2014).  Such potential for abuse can be compounded by payment of excessive royalties to many different holders of SEPs, also known as "royalty stacking."  *See also* U.S. Dep't of Justice & U.S. Dep't of Commerce, Patent & Trademark Office, Policy

11

Statement on Remedies for Standards-Essential Patents Subject to Voluntary F/RAND Commitments (Jan. 8, 2013). Higher royalties eliminate choice and may be passed on in the form of higher prices, harming consumers.  And such practices stifle the standard setting process, thereby depriving the marketplace of the significant procompetitive qualities and benefits of standard setting.

42.    In order to avoid artificially inflating royalties for SEPs that standardization abuses can produce, SSOs require participants claiming to own SEPs to identify and disclose those patents publicly and to promise to offer licenses for those patents to all implementers of the standard either royalty-free or on terms that are fair, reasonable and non-discriminatory — referred to in the industry by the acronym FRAND.

43.    A FRAND committed SEP holder promises to license its SEPs to anyone willing to accept a license, ("willing licensee").  By doing so, the SEP holder relinquishes its right to exclude a willing licensee from the standards-based technologies.  The SEP holder's FRAND commitment is a critically important check on the patent holder's power to use SEPs to "hold up" implementers of the standard by refusing to license competitors or the customers of competitors, or by licensing competitors or their customers only on discriminatory terms that undermine competition among implementers of the standard.

44.    Since the standard requires use of the patented technology, SEP holders could easily secure a profitable monopoly in the absence of their FRAND commitment.  Hence, the FRAND promise is a critical tool in preventing monopoly hold-up and ensuring that the standard remains accessible to all who wish to implement it.  *See Microsoft Corp. v. Motorola, Inc.*, No. C10-1823JLR, 2013 U.S. Dist. LEXIS 60233 (W.D. Wash. Apr. 25, 2013), at *11 (noting that SSOs combat hold-up through the use of the FRAND commitment).  Consequently, FRAND obligations are a core precondition for antitrust tolerance of the industry collaboration on which standard-setting depends.

COMPLAINT

45.     As the Third Circuit Court of Appeals has found:

a standard, by definition, eliminates alternative technologies. When a patented technology is incorporated in a standard, adoption of the standard eliminates alternatives to the patented technology. Although a patent confers a lawful monopoly over the claimed invention, its value is limited when alternative technologies exist. That value becomes significantly enhanced, however, after the patent is incorporated in a standard. Firms may become locked in to a standard requiring the use of a competitor's patented technology. The patent holder's IPRs, if unconstrained, may permit it to demand supracompetitive royalties. It is in such circumstances that measures such as FRAND commitments become important safeguards against monopoly power.

*Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 314 (3d Cir. 2007) (citations omitted).

46.     The FRAND commitment ensures that licensees can negotiate competitive rates for SEPs that are actually essential to the standard.  The leading wireless SSOs recognize the critical importance of the FRAND commitment. The TIA has stated "Market driven open standards can help promote competition and innovation, and such standards are developed or ratified through a voluntary, open and consensus based process … This type of IPR policy addresses implementers' need to access and use patented technology included in the standard; at the same time, patent holders preserve their rights in a way that encourages them to innovate and to contribute their innovative solutions to the standardization effort."  FRAND commitments **"*can and do prevent IPR holders from making the implementation of a standard difficult by refusing to license or by seeking unreasonable or discriminatory fees after the industry has been locked into the standard*."**

47.     Violation of the FRAND bargain can take several forms, including, *inter alia*, demanding unreasonable royalties; applying royalties discriminatorily (for example, charging different licensees different amounts or imposing differing conditions on different licensees, or

COMPLAINT

conditioning royalties on licensees' agreement to advantage the patent owner's products), and asserting that patents are essential to the standard when, in fact, they are not.

### C.    QUALCOMM'S    ANTICOMPETITIVE    MISCONDUCT    HARMING COMPETITION

#### 1.    Qualcomm's Market Dominance

48.    Over the years, Qualcomm has enjoyed and exercised monopoly power in the sale of baseband processor chipsets that implement several of these various cellular standards and generations.

49.    Qualcomm has monopoly power in the supply of chipsets that support CDMA on devices sold by Verizon and Sprint.  OEMs seeking to sell devices on CDMA networks must use CDMA chipsets, which means that these OEMs depend on access to Qualcomm's chipsets.

50.    Chipset purchasers need suppliers that reliably achieve roadmap performance milestones and have a good working relationship with network operators, thereby ensuring that these suppliers can obtain all of the required certifications from operators for their chipsets. A credible chipset supplier can ensure that chipset purchasers will meet their product launch dates and will have uninterrupted and reliable supply of chipsets.

51.    Qualcomm has for many years possessed over an 80% share of the CDMA chipset market despite the attempts of competitors such as Intel, VIA Telecom and Texas Instruments to enter and gain a foothold.  And, for many years, Qualcomm has maintained a dominant share of premium LTE chipsets sold in the relevant market.

52.    Between 2012 and 2014 Qualcomm had over 80% of the LTE market. Qualcomm had a 69% share of the market in 2015.  Currently, its only competitor in the LTE baseband processor market is Intel.  Qualcomm is the only manufacturer of LTE baseband processors that also include CDMA functionality.  Premium LTE chipsets, typically used in flagship smartphones, are sold by Qualcomm at different, and higher, prices. For device manufacturers seeking to sell flagship smartphones with advanced features for use on networks requiring LTE chipsets, there is no reasonable substitute for these chipsets.

14

COMPLAINT

53.    The KFTC has estimated that Qualcomm had the following market shares in each of the main baseband processor markets:

**\<Qualcomm's Market Share Trend in Modem Chipset Market per Standard (Based on Revenues)\>**

|       | Yr 2008 | Yr 2009 | Yr 2010 | Yr 2011 | Yr 2012 | Yr 2013 | Yr 2014 | Yr 2015 |
|-------|---------|---------|---------|---------|---------|---------|---------|---------|
| LTE   | -       | -       | 34.2%   | 58.8%   | 94.5%   | 96.0%   | 84.8%   | 69.4%   |
| CDMA  | 98.4%   | 97.6%   | 96.4%   | 94.3%   | 92.4%   | 93.1%   | 91.6%   | 83.1%   |
| WCDMA | 38.8%   | 47.4%   | 45.7%   | 55.0%   | 50.4%   | 53.9%   | 48.8%   | 32.3%   |

\* Source: Strategy Analytics

54.    Qualcomm's dominance in all of the relevant product markets is protected by substantial barriers to entry and expansion of new competitors.  Such barriers include, but are not limited to: (a) the time and cost of product development and network certification, including necessary economies of scale, scope, and learning by doing; (b) the intellectual property rights of Qualcomm and others; (c) establishment of product reputation and compatibility, and (d) Qualcomm's exclusionary conduct.

55.    The development of a commercially viable chipset takes years of complex engineering work and an R&D investment of hundreds of millions, and perhaps billions, of dollars. These barriers to entry increase as a function of the processing power and functionality of a particular chipset, and, as such, are especially pronounced in the premium LTE chipset market. Obtaining the certification of network operators for the use of baseband processor chipsets sold for use on their network is another barrier to entry, often involving significant expenditures of time and money.

56.    Qualcomm has declared thousands of patents as essential to the CDMA, UMTS, and LTE standards. Moreover, Qualcomm, while not asserting essentiality to the implementation of these standards, has asserted additional patents that it says cover specific implementations of these standards. Navigating this thicket of patents increases the costs and risks associated with new entry into the chipset market, foreclosing the field for new entrants.

COMPLAINT

**2.     Qualcomm's Breaches Its FRAND Commitments And Forecloses Competition in Order to Exercise and Maintain its Monopoly Power**

57.     Qualcomm belongs to the leading SSOs in the wireless communications industry and has made a commitment to license its SEPs on FRAND terms but Qualcomm has repeatedly broken its contractual promises by engaging in extortionate licensing practices that result in inflated royalty rates.

58.     As a threshold matter, Qualcomm has induced SSOs to adopt Qualcomm technology within the standard, thereby ensuring that companies implementing uniform standards would be "locked-in" with respect to its baseband processor chipset.  Then, once they were "locked-in," Qualcomm knowingly repudiated its obligation to license its SEPs on reasonable terms, failing to abide by and consequently breaching its FRAND commitments — a central stratagem of its acquisition and abuse of monopoly power in the cellular industry. Qualcomm has refused to license its SEPs to competing chipset manufacturers.  It has refused to sell its chipsets to customers unless they first license Qualcomm's SEPs.

59.     Qualcomm has also forced purchasers of its chipsets to take a license to its SEPs at extortion-level royalties, and has threatened "disloyal" chipset customers with even less-favorable royalties and license terms if they purchased chipsets from its competitors. Qualcomm has also discriminated between potential licensees by refusing to license its SEPs to competitors, and offering only "rebates" rather than a direct FRAND license.  As a result of this misconduct, Qualcomm has and continues to exclude competition in the chipset market, an intended consequence that has also been fueled by foreclosing competitors from dealing with Apple, which is a key purchaser of chipsets, thereby facilitating their marginalization and exit from the market, further enhancing Qualcomm's monopoly power.

**(a)     "Double-Dipping" Re: Royalties and Chipset Sales**

60.     A baseband processor chipset sells for around $10 to $20.  Patent royalties typically are set as a fraction of a percent of the patented item (e.g., the smallest salable patent practicing unit).  For FRAND encumbered patents, royalties typically follow the same approach

16

1   and are a fraction of a percent chipset.  Qualcomm's royalty demands approach and in some

2   cases surpass the baseband processor sales price.

3          61.    Even where Qualcomm sells its own chips, it requires purchasers to agree to its

4   license agreements — which include the royalty rate based on the selling price of the device.  In

5   effect, cellular devices today are unable to connect to their network without paying a royalty

6   (between 3% - 5% of the price of the device) to Qualcomm.  Qualcomm's royalty rates of 5%

7   for most CDMA products and 3.25% for recent LTE-based products are significantly higher

8   than others in the industry.

9          62.    Qualcomm's "no license no chips" policy — requiring customers to take a

10  separate patent license for the same components that they purchase — is "double-dipping."  It

11  extracts royalty fees on top of chipset sales, a practice that is prohibited by the patent exhaustion

12  doctrine which maintains that the "authorized sale of an article that substantially embodies a

13  patent exhausts the patent holder's rights and prevents the patent holder from invoking patent

14  law to control postsale use of the article." *Quanta Computer, Inc. v. LG Elecs., Inc*., 553 U.S.

15  617, 638 (2008).

16         63.    As the FTC recently alleged after a two-year investigation of Qualcomm

17  Qualcomm's "no license-no chips" policy is an aberrant departure from prevailing patent

18  licensing practices. According to the FTC, "Qualcomm is unique in requiring an OEM, as a

19  condition of sales, to secure a separate patent license requiring royalty payments for handsets

20  that use a competitor's components." Complaint for Equitable Relief ("FTC Compl.") ¶ 68, *FTC*

21  *v. Qualcomm Inc*., No. 5:17-cv-00220 (N.D. Cal. Jan. 17, 2017), ECF. No. 1.

22

23                 **(b)     Leveraging a "thicket"of patents to extort royalties**

24         64.    Qualcomm owns a very large numbers of patents around the world that have

25  been disclosed to ETSI as potentially essential to one or more cellular standards.  According to

26  ETSI's self-reporting portal, Qualcomm has declared over 30,000 global assets to be

27  "ESSENTIAL IPR."

28

COMPLAINT

65.     Where a patent is declared essential to a standard, the appropriate royalty varies on a patent-by patent basis.  This is necessary because the strength of each patent and the value compared to commercially available alternatives examined prior to the patent's incorporation into a standard must be taken into account.  Qualcomm's licensing practices are premised on every licensee taking a license to a large, but unspecified, "thicket" of patents—an entire portfolio.  Qualcomm attempts to avoid the patent-by-patent analysis that is ordinarily required for any licensing demand, instead hiding behind the sheer volume of this patent portfolio thicket to extort royalties from potential licensees.

66.     Failing to offer an individual license on a patent-by-patent basis (or a patent family-by-patent family basis) violates Qualcomm's FRAND obligation.

(c)     **Charging an exorbitantly high royalty that is expressed as a percentage of the entire market value of the finished device**

67.     The exorbitant royalty demanded by Qualcomm, per device, is based on the net selling price of the finished device.  This does not comply with patent law or Qualcomm's FRAND obligations.

68.     For example, Apple sells high-end products with a selling price between $399 for a 16GB iPhone SE and $969 for a 256GB iPhone 7 Plus, whereas Walmart sells an unlocked 16GB Kyocera 4G LTE smartphone for under $100. [Apple, www.apple.com/iphone; Walmart, https://www.walmart.com/ip/Kyocera-DuraForce-E6560-16GB-Unlocked-GSM-4G-LTE-Military-Grade-Smartphone-w8MP-Camera-Black/117746885.]  The two phones have different costs, different consumer appeal, and different prices, for reasons almost entirely unrelated to the wireless voice and data capability contributed by Qualcomm's purportedly standard-essential patents.  Nonetheless, as Apple has maintained, Qualcomm insists on a far-greater royalty payment for the use of its SEPs in the more expensive phone, even though the contribution of wireless capability to both phones is similar. As a result, Apple's royalty payment for the 16GB iPhone 6 SE would be about four to nine times more than Kyocera's royalty for its smartphone.

COMPLAINT

69.    Royalty payments should not fluctuate based on purchasing decisions by downstream customers, who desire features, such as more memory, that are not covered by Qualcomm's SEP patents.

70.    Setting a royalty base at of the average selling price of the device is contrary to binding Supreme Court and Federal Circuit precedent that forbids basing a royalty on an entire device unless the patent at issue drives consumer demand for the whole device.  Patent holders are required to base royalties, at most, on the smallest salable patent-practicing unit. *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012) ("Where small elements of multi-component products are accused of infringement, calculating a royalty on the entire product carries a considerable risk that the patentee will be improperly compensated for non-infringing components of that product. Thus, it is generally required that royalties be based not on the entire product, but instead on the "smallest salable patent-practicing unit."); *Golden Bridge Tech. v. Apple Inc.*, No. 5:12-cv-04882-PSG, 2014 U.S. Dist. LEXIS 68564 at *17 (N.D. Cal. May 18, 2014) ("[I]n any case involving multi-component products, patentees may not calculate damages based on sales of the entire product, as opposed to the smallest saleable patent-practicing unit ['SSPPU'], without showing that the demand for the entire product is attributable to the patented feature."). Furthermore, "[w]here the smallest salable unit is, in fact, a multi-component product containing several non-infringing features with no relation to the patented feature . . . , the patentee must do more to estimate what portion of the value of that product is attributable to the patented technology." *VirnetX, Inc. v. Cisco Sys., Inc.,* 767 F.3d 1308, 1327 (Fed. Cir. 2014). A royalty that fails to comply with these requirements violates the FRAND promise.  *In re Innovatio IP Ventures, LLC,* 2013 U.S. Dist. LEXIS 144061, at *77 (N.D. Ill. Sep. 27, 2013) (applying the smallest salable unit requirement to FRAND royalties); *Microsoft* , 2013 U.S. Dist. LEXIS at *53-55 (A reasonable royalty must take into account not only the contribution of the patented technology to the standard, but the "contribution of those capabilities of the standard to the implementer and the implementer's products.").

COMPLAINT

71.     Qualcomm's high nominal royalty rates for its SEPs are well above the upper bounds of a reasonable royalty under FRAND, particularly for feature-rich smartphones and tablets that offer a number of technologies and features other than those covered by its purportedly standard-essential patents.  In addition, Qualcomm's exorbitant royalty demands lay the foundation for the exclusive dealing and tying arrangements that it uses to exclude chipset competitors, giving Qualcomm leverage to foreclose its competitors from accessing chipset customers.

**(d)     Discriminating between potential licensees by failing to license its competitors**

72.     The requirement that a license to a SEP be non-discriminatory helps "to insure that standards do not allow essential patent owners to extort their competitors or prevent them from entering the marketplace." *Apple, Inc. v. Motorola Mobility, Inc.*, No. 11-cv-178-bbc, 2011 U.S. Dist. LEXIS 72745, at *6 (W.D. Wis. June 7, 2011). Qualcomm breached its FRAND promise by failing to offer its competitor baseband processor chipset manufacturers a license, harming competition in the industry.

73.     Prior to 2008, Qualcomm licensed its FRAND-encumbered cellular SEPs to competing chipset manufacturers, and acknowledged its obligations to do so pursuant to its FRAND commitments. For example, in response to an investigation by the European Commission of its anticompetitive conduct, Qualcomm stated publicly in 2005 that it had "never refused to license our essential patent to any company to supply chips, handsets, infrastructure or test equipment." In the same year, Qualcomm claimed that it had licensed numerous chipset manufacturers, including competitors such as Nokia, Texas Instruments, and NEC, and that these licenses showed that Qualcomm "has lived up to its commitments to SSOs to license its essential patents on fair and reasonable terms."

74.     In 2007, Qualcomm claimed publicly that competing manufacturers of CDMA and UMTS/WCDMA chipsets "have to take out a license from Qualcomm" and that Qualcomm

COMPLAINT

had been "pretty consistent in that model."   Qualcomm represented to the United States Supreme Court that it had granted worldwide licenses to chipset manufacturers with a running royalty calculated as a percentage of the selling price of the chipset. Brief of Qualcomm Inc. as Amicus Curiae Supporting Respondent at 7, *Quanta Computer, Inc. v. LG Elecs., Inc.*, 553 U.S. 617 (2008) (No. 06-937).   Qualcomm identified its practice of "licensing its intellectual property to entities that produce (non-Qualcomm) chips" as one of its three "primary sources of revenue," thereby acknowledging the feasibility and efficiency of licensing at the chipset level. *Id.*

75.     But, in truth, around 2007, Qualcomm's practice of licensing its FRAND encumbered cellular SEPs to competitors changed.   Qualcomm has been unwilling since at least 2008 to license its SEPs to competitors, refusing to provide such licenses when requested. Qualcomm's 2014 10-K stated that Qualcomm's policy was to enter into "arrangements," but not exhaustive licenses, with competing chipset manufacturers. According to the KFTC, Samsung, Intel, and VIA Telecom have all requested SEP licenses from Qualcomm, and been refused.

76.     FRAND license would give competing chipset manufacturers the right to market authorized, patent-exhaustive sales of chipsets to various mobile device suppliers. Qualcomm's failure to license on FRAND terms eliminates the ability of mobile device suppliers to purchase chipsets from Qualcomm's competitors without also paying royalties to Qualcomm, and thus exposes mobile device suppliers to the threat of exorbitant non-FRAND royalties based on the price of their mobile devices, a threat which, Apple, as one example, has maintained Qualcomm uses to force Apple to deal exclusively with Qualcomm on the purchase of chipsets.

### 3.     Qualcomm's Conduct Has Forced its Competitors to Exit the Market

77.     Qualcomm has engaged in unfair and exclusionary conduct in order to maintain and strengthen its monopoly position in the relevant product markets.  Qualcomm has deprived rival chipset manufacturers of necessary economies of scale, scope, and essential experience.

21

COMPLAINT

78.     In 2006, there were multiple vendors of baseband chipsets, including Broadcom, Ericsson, Renesas, and Texas Instruments. Today, Intel is Qualcomm's only competitor in the market for premium LTE chipsets, and Qualcomm has no competition at all in the market for premium LTE chipsets with CDMA functionality. Not coincidentally, Intel has been the target of Qualcomm's exclusionary efforts to force an OEM manufacturer such as Apple to refrain from introducing Intel chipsets in Apple products.

### D.     Qualcomm's Abusive Conduct Has Received Global Condemnation

79.     Qualcomm's abusive and unfair practices have received global condemnation by courts and foreign and domestic regulatory agencies, including regulators of competition practices in China, South Korea, Taiwan, Japan, Europe, and the United States.   Numerous regulatory commissions and competition law enforcement authorities around the world have concluded, or are about to conclude, that Qualcomm's conduct is anticompetitive, unfair, and injurious to consumers.

80.     On February 10, 2015, after investigating Qualcomm's SEP licensing practices,[2] China's NDRC determined that Qualcomm violated provisions of the China Anti-Monopoly Law, because Qualcomm (1) controlled the SEP Licensing Market and the CDMA, WCDMA, and LTE baseband chip markets, and (2) abused that dominance by, among other things, charging excessive and unfairly high royalties to any licensees that were "forced" to accept the packaged patent licenses, the royalty rates of which were based on the total wholesale prices of smart phones.   In addition to imposing a fine of eight percent of Qualcomm's annual revenue within the territory of China for 2013—a $975 million fine — China's NDRC also ordered Qualcomm to materially lower the effective royalty by calculating its royalty at 65% of the net selling price.

---

[2]     H. Stephen Harris, Jr., *An Overview of the NDRC Decision in the Qualcomm Investigation July 2015*, CPI Antitrust Chronicle (July 2015), available at http://www.winston.com/en/thought-leadership/an-overview-of-the-ndrc-decision-in-the qualcomm-investigation.html (last visited February 13, 2017).

COMPLAINT

81.     Soon after the NDRC issued its decision, Qualcomm implemented a rectification plan that purportedly modifies certain of its business practices in China. That plan has never been adopted or endorsed by any agency or court.  However, Qualcomm purports to have executed numerous license agreements with Chinese manufacturers on terms consistent with the rectification plan. Notably, under the rectification plan, Qualcomm unilaterally set the 5% and 3.5% royalty rates as well as selected the base of 65% of the net selling price of the device. [See Press Release, Qualcomm and China's National Development and Reform Commission Reach Resolution,     Qualcomm     (Feb.     9,     2015),     https://www.qualcomm. com/news/releases/2015/02/09/qualcomm-and-chinas-national-development-and-reform-commission-reach.]  No declaration or statement by any administrative body has found these terms to be consistent with Qualcomm's obligations to grant licenses to SEPs on FRAND terms.

82.     The Japan Fair Trade Commission ("JFTC") has been investigating Qualcomm since 2006. In September 2009, the JFTC concluded that Qualcomm violated the Japanese Antimonopoly Act by forcing licensees to cross-license their patents on a royalty-free basis and agree to a non-assert provision, and ordered the company to cease these practices.

83.     In December 2016, the KFTC fined Qualcomm $853 million due to its monopolistic and anticompetitive conduct, and mandated changes to Qualcomm's business model.  The KFTC found, *inter alia*, that Qualcomm had coerced patent license agreements from handset companies while holding hostage the supply of chipsets.  In other words, "Qualcomm actually used the threat of terminating the supply of modem chipsets as ***negotiation leverage*** in the process of license negotiations with handset companies." (Emphases in original).[3] The KFTC found Qualcomm's control over the chipset market "is a structure under which handset companies have to bite the bullet and accept Qualcomm's license terms, even if they are unfair, because if the modem chipset supply is suspended, handset companies would face the ***risk*** of their ***entire business*** shutting down."  (Emphases original).  This was not the

---

[3]     *See* Yoonhee Kim & Hui-Jin Yang, *A Brief Overview of Qualcomm v. Korea Fair Trade Commission*, CPI Antitrust Chronicle, https://www.competitionpolicyinternational.com/assets/Uploads/KimYangMar-151.pdf (last visited on February 13, 2017).

COMPLAINT

first time Qualcomm was fined by KFTC.  In July of 2009, the KFTC fined Qualcomm $207 million — the largest the KFTC had ever imposed on a company at that time for abusing its dominant share of the chipset market and the SEP license market.

84.    In December 2015, the Taiwan Fair Trade Commission ("TFTC") notified Qualcomm that it had commenced an investigation into its licensing behavior, including whether Qualcomm's royalty charges are unreasonable.  In December, 2015, the European Commission issued a "Statement of Objections" against Qualcomm, which alleged that Qualcomm's practices harmed chipset competition and innovation.

85.    Nevertheless, Qualcomm remained undeterred.  Consequently, on January 17, 2017, the FTC filed an enforcement action in this Court seeking a permanent injunction against Qualcomm to undo and prevent its unfair methods of competition in or affecting commerce in violation of Section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45(a).  In its lawsuit, the Commission has alleged, *inter alia*, that Qualcomm (a) withholds its baseband processors unless a customer accepts a license to standard-essential patents on terms preferred by Qualcomm, including elevated royalties; (b) consistently refuses to license its cellular standard essential patents to its competitors, in violation of Qualcomm's FRAND commitments, and (c) entered into exclusive dealing arrangements with Apple Inc., which denied other baseband processor suppliers the benefits of working with a particularly important cell phone manufacturer and hampered their development into effective competitors.

## VI.    QUALCOMM'S ANTICOMPETITIVE EFFECTS

### A.    Qualcomm's Conduct Directly Harms Consumers

86.    Qualcomm's aforesaid conduct and abusive exploitation and maintenance of its monopoly power has directly resulted in harm to Plaintiffs and the Class by causing them to pay higher prices for their cellular devices than they would have in the absence of Qualcomm's conduct.

87.    Device manufacturers such as Samsung, and network carriers such as Verizon and Sprint, are subject to vigorous price competition.  Qualcomm admits that "[r]oyalties are

COMPLAINT

generally based upon a ***percentage of the wholesale (i.e., licensee's) selling price of complete licensed products***, net of certain permissible deductions (including transportation, insurance, packing costs and other items)." (Emphases added).[4] The patent rights owned by Qualcomm are thus inextricably intertwined with the cellular devices themselves—and the effect of the anticompetitive conduct at issue in this case is targeted at the cellular device as a whole and not components thereof, as reflected by the royalty's derivation from the price of the cellular device as a whole.

88.     Rather than absorb Qualcomm's unlawful royalties which are a percentage of the wholesale cost of the device itself, device manufacturers and network carriers pass along some, or all, of the excessive royalty to consumers.

89.     Since cellular devices are commodity products that consumers purchase as standalone product devices either from the direct purchaser device manufacturer or through their network carrier, it is the consumers, such as the Plaintiffs, who are consequently harmed. As an example, chipsets, or baseband processers, cost as little as $10 to $13, but royalty demands associated with this component approach $60 for a $400 smartphone.[5] This disparity between royalty demands and component costs results in an increased cost for the cellular device, which is directly passed on to the consumer.

90.     It has been observed by reputable antitrust scholars that "in a multiple- level chain of distribution, passing on monopoly overcharges is not the exception: it is the rule."[6] As Economist and Professor Jeffrey K. MacKie-Mason has stated:

---

[4]     Calculating a royalty rate for a product component based on the price of the product as a whole is particularly imnappropriate and unfair.  *E.g.*, *Laser Dynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d at 67 ("[w]here small elements of multi-component products are accused of infringement, calculating a royalty on the entire product carries a considerable risk that the patentee will be improperly compensated for non-infringing components of that product.").

[5]     *See supra* note 2; *see also* Nomura 2012 Smartphone Guide http://www.patenttoday.com/wp-content/uploads/2014/08/nomura_smartphone_poster_2012.pdf (last visited February 13, 2017).

[6]     RG Harris & LA Sullivan, *Passing-On the Monopoly Overcharge: A Comprehensive Policy Analysis*, 128 U. PA. L. REV. 269, 276 (1979).

25

COMPLAINT

As is well known in economic theory and practice, at least some of the overcharge will be passed on by distributors to end consumers. When the distribution markets are highly competitive, as they are here, all or nearly the entire overcharge will be passed on through to ultimate consumers…

91. Qualcomm's anticompetitive acts have directly distorted the price of the cellular devices paid by consumers of such devices. Plaintiffs and members of the Class have been forced to pay supra-competitive prices for cellular devices. Since Qualcomm licenses base its royalties on "a percentage of the wholesale . . . selling price of a complete licensed product," purchasers of cellular devices are only one level removed from the unlawful overcharge at issue here — not a complicated pass-through analysis. The amount of the harm to consumers arising from Qualcomm's anticompetitive conduct — the precise amount of the overcharge impacting the prices of cellular devices purchased by consumers — is measureable through commonly accepted statistical and regression modeling. And once Qualcomm is forced to stop abusing its monopoly power and charge a fair and reasonable royalty, consumers shall receive better prices when purchasing cellular devices.

**E.    Market Definition**

92. The relevant geographic market for purposes of this action is the United States and its territories.

93. The relevant product markets are: (1) the market for CDMA and premium LTE modem chipsets ("Modem Chipset Market"), also known as baseband processors, which allow cellular devices to communicate with carrier networks and (2) intellectual property rights associated with SEPs ("SEP Licensing Market").These two products will be referred to collectively as the "Cellular Device Components."

94. Qualcomm directly participates in the market for the sale of cellular devices to Plaintiffs and Class Members by encumbering cellular devices through its licenses (and related excessive royalties). Specifically, Qualcomm's royalty payments are calculated as a percentage of the wholesale price of the cellular devices, which in turn increase the retail price of those devices.

26

COMPLAINT

95.     Plaintiffs purchase the Cellular Device Components when they buy a cellular device.   Plaintiffs' injuries are inextricably intertwined with Qualcomm's anti-competitive conduct with respect to chipset modems and abuse of patent rights because it has increased the cost to them of buying cellular devices by, among other things, (1) eliminating competition, allowing Qualcomm to charge supracompetitive prices for its chipsets and licenses; and (2) forcing device manufacturers to agree to onerous licensing terms, including excessive royalties.

## VII.    CLASS ACTION ALLEGATIONS

96.     Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable, injunctive relief and monetary relief under California law on behalf of the following class (the "Nationwide Class"):

> All persons and entities in the United States who purchased, paid and/or provided reimbursement for some or all of the purchase price for CDMA- and/or premium LTE cellular devices ("Relevant Cellular Devices") from January 17, 2013 through the present.  This class excludes: (a) Defendant, its officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal and state governmental entities except for those who have purchased Relevant Cellular Devices; (c) all persons or entities who purchased Relevant Cellular Devices for purposes of resale or directly from Defendant; (d) any judges or justices involved in this action and any members of their immediate families or their staff.

97.     Alternatively to the claim for nationwide monetary relief under California law, Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages or monetary relief  pursuant to the common law of unjust enrichment and individual state antitrust, unfair competition, and consumer protection laws for each of the states identified herein on behalf of the following class (the "Damages Class"):

> All persons and entities in the United States who purchased, paid and/or provided reimbursement for some or all of the purchase price for CDMA-, and/or premium LTE cellular devices ("Relevant Cellular Devices") from January 17, 2013 through the present.  This class excludes: (a) Defendant, its officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal and state

27

COMPLAINT

governmental entities except for those who have purchased Relevant Cellular Devices; (c) all persons or entities who purchased Relevant Cellular Devices for purposes of resale or directly from Defendant; (d) any judges or justices involved in this action and any members of their immediate families or their staff.

98.    The Nationwide Class and the Damages Class are referred to herein as the "Classes."

99.    While Plaintiffs do not know the exact number of the members of the Classes, Plaintiffs believe there are millions of members in each Class.

100.    Common questions of law and fact exist as to all members of the Classes.  This is particularly true given the nature of Qualcomm's conduct to acquire and maintain monopoly power, which was and is generally applicable to all the members of both Classes, thereby making appropriate relief with respect to the Classes as a whole.  Such questions of law and fact common to the Classes include, but are not limited to:

(a)    Whether Qualcomm possessed monopoly power in the Modem Chipset Market (underlying the Cellular Device Components) in the United States during the Class Period;

(b)    Whether Qualcomm attempted to possess monopoly power in the modem chipset market (a critical market underlying the Cellular Device Components) in the United States during the Class Period;

(c)    Whether Qualcomm possessed monopoly power in the SEP Licensing Market (for licences critical to the technology underlying the Cellular Device Components) in the United States during the Class Period;

(d)    Whether Qualcomm attempted to possessed monopoly power in the SEP Licensing Market (for licenses critical to the technology underlying the Cellular Device Components) in the United States during the Class Period;

(e)    Whether Qualcomm tied the sale of its CDMA- and premium LTE- based chipsets to the purchase of license rights to its patent portfolio (including SEPs and nonSEPs);

(f)    Whether the conduct of the Qualcomm, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Classes;

28

(g)    The effect of Qualcomm's unlawful conduct on the prices of Relevant Cellular Devices sold in the United States and its territories during the Class Period;

(h)    Whether Qualcomm tied the sale of its SEPs with the purchase of its nonSEPs;

(i)    Whether Qualcomm's acquisition and maintenance of its monopoly in the power in the Modem Chipset Market violated the Sherman Act, as alleged in the First Claim for Relief;

(j)    Whether Qualcomm's acquisition and maintenance of its monopoly in the SEP Licensing Market (for licenses critical to the technology underlying cellular device market) violated the Sherman Act, as alleged in the First Claim for Relief;

(k)    Whether Qualcomm's conduct violated California's Cartwright Act, Cal. Bus. & Prof. Code §§ 16700, *et seq*., as alleged in the Second Claim for Relief;

(l)    Whether Qualcomm's conduct violated state antitrust and unfair competition laws, and/or state consumer protection laws, as alleged in the Third and Fourth Claims; and

(m)    Whether the Qualcomm unjustly enriched itself to the detriment of the Plaintiffs and the members of the Classes, thereby entitling Plaintiffs and the members of the Classes to disgorgement of all benefits derived by Qualcomm, as alleged in the Fifth Claim for Relief.

101.    The appropriate injunctive and related equitable relief.

102.    The appropriate class-wide measure of damages.

103.    Plaintiffs' claims are typical of the claims of the members of the Classes, and Plaintiffs will fairly and adequately protect the interests of the Classes.  Plaintiffs and all members of the Classes are similarly affected by Qualcomm's wrongful conduct in that they paid artificially inflated prices for purchased indirectly from Qualcomm.

104.    Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes.  Plaintiffs' interests are coincident with, and not

COMPLAINT

1   antagonistic to, those of the other members of the Classes.  Plaintiffs are represented by counsel

2   who are competent and experienced in the prosecution of antitrust and class action litigation.

3        105.   The questions of law and fact common to the members of the Classes

4   predominate over any questions affecting only individual members, including legal and factual

5   issues relating to liability and damages.

6        106.   Class action treatment is a superior method for the fair and efficient adjudication

7   of the controversy, in that, among other things, such treatment will permit a large number of

8   similarly situated persons to prosecute their common claims in a single forum simultaneously,

9   efficiently and without the unnecessary duplication of evidence, effort and expense that

10  numerous individual actions would engender.  The benefits of proceeding through the class

11  mechanism, including providing injured persons or entities with a method for obtaining redress

12  for claims that it might not be practicable to pursue individually, substantially outweigh any

13  difficulties that may arise in management of this class action.

14       107.   The prosecution of separate actions by individual members of the Classes would

15  create a risk of inconsistent or varying adjudications, establishing incompatible standards of

16  conduct for Defendant.

## VIII.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**(Monopolization in Violation of Sections 2 and 3(b) of the Sherman Act)**

     108.   Plaintiffs incorporate the foregoing allegations as though fully set forth at length herein.

     109.   The relevant product markets are the CDMA and LTE baseband processor markets and the SEP technology licensing market.  The relevant geographic market is the world. Since before January 1, 2008, Qualcomm has engaged in a systematic pattern of anticompetitive conduct designed to exclude competition from the baseband processor markets.

COMPLAINT

110.    Qualcomm possesses monopoly power in the CDMA and LTE baseband processor markets. Qualcomm has consistently held over a 90% share of the CDMA baseband processor market between 2001 and 2015.  From 2012 to 2014 Qualcomm held an over 80% share of the LTE baseband processor market.  In 2015, Qualcomm had 83% of the CDMA market and 69% of the LTE market.

111.    LTE baseband processors are a necessary component of premium smartphones such as the Apple iPhone and the Samsung Galaxy.  These devices are designed to function with carrier networks that require LTE compatibility, such as each of the major U.S. wireless networks. No other product, such as CDMA or UMTS baseband processors, are available as a substitute for LTE baseband processors and no other product constrains the price of LTE baseband processors at levels below the monopoly price.

112.    CDMA baseband processors are a necessary component of devices that are intended for use on carrier networks that require CDMA compatibility. No other products, including UMTS and LTE baseband processors, are a substitute for CDMA baseband processors for devices intended for use on networks that require CDMA compatibility, and no other product constrains the price of CDMA baseband processors at levels below the monopoly price.

113.    The standardization process eliminates other potential technological competitors to the chosen standard. Once a standard is chosen, competing technologies are no longer available.   The standard setting process confers monopoly power on SEP owners because their technologies are necessary to practice the standard. Qualcomm's FRAND commitments induced SSOs to incorporate technologies covered by Qualcomm's declared-essential patents for the relevant standards, and therefore eliminated competition within the relevant SEP licensing market.

114.    Qualcomm's anticompetitive refusal to license its SEPs on FRAND terms has successfully prevented competition in the CDMA and LTE baseband processor markets. Qualcomm has also entered into exclusive dealing arrangements with OEMs, such as Apple, that prevent competition from developing in the baseband processor markets. But for

COMPLAINT

Qualcomm's conduct, rival manufacturers would have become stronger competitors in the baseband processor markets.

115.     A FRAND license would give competing baseband processor manufacturers the right to market authorized sales of baseband processors to OEMs. Qualcomm's failure to license on FRAND terms eliminates the ability of OEMs to purchase baseband processors from competing manufacturers. This, in turn, allows Qualcomm to demand inflated royalty rates from OEMs for its SEPs. Qualcomm's refusal to offer a FRAND license to competitors is a key causal component of its acquisition and maintenance of monopoly power in the CDMA and LTE baseband processor markets.  Qualcomm's refusal to offer SEP licenses on FRAND terms to its competitors, as alleged above, is an unlawful refusal to deal with competitors and an act of monopolization under Section 2 of the Sherman Act.

116.     Qualcomm possesses monopoly power in the SEP licensing market because OEMs and competitor manufacturers need licenses to Qualcomm's SEPs in order to make and sell products and services that utilize the wireless standards. Once a wireless standard is agreed upon, a company is locked into that standard if it wants to sell products and services based on that standard.

117.     Qualcomm ties licenses to its SEPs to purchases of baseband processors despite the fact that OEMs would prefer to purchase these products on an unbundled basis. Qualcomm's actions foreclose substantial portions of the baseband processor markets to Qualcomm's competitors.  Qualcomm's "no chips no license" policy further contributes to its creation and maintenance of monopoly power.

118.     Qualcomm has attempted to maintain its monopoly power by withholding royalty payments from OEMs, such as Apple, that have cooperated with ongoing investigations by government regulators into Qualcomm's anticompetitive business practices.

119.     There is also no procompetitive justification for Qualcomm's refusal to license its SEPs to competitor manufacturers. This action undermines the FRAND terms that are necessary to ensure that technical standards are not abused by monopolists who are granted market power

COMPLAINT

solely from the lock in that occurs after a standard is formulated.  There is no procompetitive justification for demanding that OEMs purchase a bundled version of both Qualcomm's chips and licenses. Instead, every other cell phone component manufacturer conveys their intellectual property rights with the sale of the products embodying that intellectual property. That approach is, in fact, mandated by the doctrine of patent exhaustion.

120.    Substantial barriers to entry and expansion exist in the relevant markets.

121.    Qualcomm has the power to control prices and exclude competition in the relevant markets.

122.    Since at least January 1, 2008, Qualcomm has engaged in conduct with anticompetitive effects to: (a) unlawfully maintain and enhance its monopoly in the relevant markets and to keep prices high; and (b) stifle competition and eliminate consumer choice through unlawful exclusionary behavior designed to prevent other competitors and potential competitors weak, undersized, and unable to achieve a minimum efficient scale of operation needed to offer a viable substitute for Qualcomm's CDMA and LTE baseband processors.

123.    Qualcomm has charged supracompetitive prices for its CDMA and LTE baseband processors as well as licensing rights for its patent portfolio.

124.    There is no legitimate business justification for Qualcomm's conduct, nor precompetitive justification for preventing the application of antitrust laws to its unlawful behavior.

125.    Plaintiffs and other members of the Class have been injured and will continue to be  injured in their businesses and property by paying more for baseband processors and associated patent licensing rights purchased indirectly from Qualcomm than they would have paid and would pay in the future in the absence of Qualcomm's unlawful acts, including paying more for cell phones and tablets in which baseband processors are a component, as a result of higher prices paid for baseband processors and patent licenses by the manufacturers of those products.  Additionally, Qualcomm's conduct has harmed innovation and competition, which harmed Plaintiffs in the quality and price of their cellular devices.

COMPLAINT

126.    Plaintiffs and other members of the Class are entitled to an injunction that terminates the ongoing violations alleged in this Complaint.

### SECOND CLAIM FOR RELIEF

**(Nationwide Claim for Violation of the California Cartwright Act, Cal. Bus. & Prof. Code § 16720, *et seq.*)**

127.    Plaintiffs incorporate the foregoing allegations as though fully set forth at length herein.

128.    Qualcomm's contracts, trusts or conspiracies were entered into, carried out, effectuated and perfected mainly within the State of California, and Qualcomm's conduct within California injured all Class members throughout the United States. Therefore, this claim for relief under California law is brought on behalf of all Class members, whether or not they are California residents.  It is appropriate to apply California antitrust law to the Nationwide class given Qualcomm's significant presence, antitrust and monopolistic activities and head, _____ in California.  Qualcomm subjected its competitors and device manufacturers that reside and do business in California to its unlawful conduct.  Qualcomm has reaped a significant portion of its profits as a result of its unlawful scheme and conduct from companies doing business in California, including many that are headquartered in California, which is the state with the largest population in America and for which it was foreseeable that a substantial number of California consumers would be impacted by Qualcomm's unlawful behavior.

129.    Beginning at a time presently unknown to Plaintiffs, but at least as early as June 28, 2008, and continuing to today, Qualcomm and its co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Section 16720, California Business and Professions Code. Through agreements with its customers and with standards-setting bodies as alleged herein, Qualcomm conspired in violation of Section 16720 to maintain monopoly power in the relevant markets and to set prices for baseband processors and SEPs at supracompetitive levels.

34

COMPLAINT

130.    For the purpose of forming and effectuating the unlawful contracts, trusts or conspiracies, Qualcomm has done those things that it combined and conspired to do as alleged in this Complaint, including but in no way limited to the following:

    a.    entering into exclusive and near-exclusive deals with OEMs;

    b.    pressuring OEMs to agree not to support product launches of Qualcomm's competitors;

    c.    entering into exclusive and near-exclusive deals with distributors; and

    d.    entering into exclusive and near-exclusive deals with retailers.

131.    The contracts, trusts or conspiracies alleged herein have had, *inter alia*, the following effects:

    a.    price competition in the sale of baseband processors has been restrained, suppressed and/or eliminated in the State of California and throughout the United States;

    b.    prices for baseband processors sold by Qualcomm and its co-conspirators have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the State of California and throughout the United States; and

    c.    prices for patent licenses have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the State of California and throughout the United States; and

    d.    those who purchased baseband processors from Qualcomm have been deprived of the benefit of free and open competition.

132.    Plaintiffs and the Class members paid and continue to pay supracompetitive, artificially inflated prices for cellular phones and tablets.

133.    As a direct and proximate result of Qualcomm's unlawful conduct, Plaintiffs and the Class members have been injured in their businesses and property in that they paid more for Qualcomm's baseband processors (or for products containing such baseband processors) and patent licenses than they would have paid absent Qualcomm's unlawful conduct. As a result of Qualcomm's violation of Section 16720, Plaintiffs and the Class members seek treble damages

COMPLAINT

and the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and Professions Code.

## THIRD CLAIM FOR RELIEF

**(Nationwide Claim for Violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 et seq.)**

134.    Plaintiffs incorporate the foregoing allegations as though fully set forth at length herein.

135.    Qualcomm's business acts and practices were centered in, carried out, effectuated and perfected mainly within the State of California, and Qualcomm's conduct within California injured all Class members throughout the United States. Therefore, this claim for relief under California law is brought on behalf of all Class members, whether or not they are California residents.

136.    Beginning on a date unknown to Plaintiffs, but at least as early as January 1, 2008 and continuing to the present, Qualcomm committed and continue to commit acts of unfair competition, as defined by Sections 17200, *et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above.

137.    This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from Qualcomm for acts that violated Section 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law ("UCL").

138.    Qualcomm's conduct as alleged in this Complaint constitutes unfair, unlawful and/or fraudulent practices within the meaning of the Unfair Competition Law, including but not limited to the following:

a.    Qualcomm violated the UCL by means of its violations of Section 2 of the Sherman Act, as set forth above;

b.    Qualcomm violated the UCL by means of its violations of Section 16720, *et seq.*, of the California Business and Professions Code, as set forth above; and

36

COMPLAINT

> c.   Qualcomm's acts and practices are unfair to consumers of baseband processors and SEP licenses in the State of California and throughout the United States within the meaning of the UCL.

139.   Plaintiffs and Class members are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits which may have been obtained by Qualcomm as a result of such business acts or practices.

140.   Qualcomm's illegal conduct is continuing, and there is no indication that it will not continue such activity in the future.

141.   Qualcomm's unlawful and unfair business practices have caused and continue to cause Plaintiffs and the Class members to pay supracompetitive and artificially-inflated prices for baseband processors (or products containing baseband processors) and licenses to Qualcomm's SEPs.  Plaintiffs and the Class members suffered injury in fact and lost money or property as a result of the unfair competition.

142.   As alleged in this Complaint, Qualcomm has been unjustly enriched as a result of its wrongful conduct and by its unfair competition.  Plaintiffs and Class members are accordingly entitled to equitable relief, including restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits obtained by Qualcomm as a result of such business practices, pursuant to the California Business and Professions Code §§ 17203 and 17204.

## FOURTH CLAIM FOR RELIEF
### (Violations of State Antitrust and Restraint of Trade Laws)

143.   Plaintiffs repeat the allegations set forth above as if fully set forth herein.

144.   In the event that the Court does not apply California law on a nationwide basis, Plaintiffs allege the following violations of state antitrust and restraint of trade laws in the alternative on behalf of the Damages Class.

145.   Defendant Qualcomm's anticompetitive acts described above were knowing, willful, and constitute violations or flagrant violations of the following state antitrust statutes.

COMPLAINT

146.   **California**: During the Class Period, Qualcomm engaged in monopolistic and anticompetitive conduct in unreasonable restraint of trade and commerce and in violation of California Business and Professions Code sections 16700, *et seq.*  While Section 16700 does not reach solely unilateral conduct by a monopolist, it encompasses agreements between a monopolist and its customers where the monopolist effectively coerces the customer to accede to the restraint in order to obtain the good or service that is the subject of the agreement.  That is what happened here.  Despite its FRAND obligations, Qualcomm unilaterally imposed royalty rates that were unreasonable and exceeded what it could have obtained in a true FRAND negotiation.  This conduct constitutes a "combination" under the Cartwright Act.

147.   **Florida:**   Qualcomm has engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq.*   Qualcomm's unlawful conduct had the following effects:  (1) Relevant Cellular Devices price competition was restrained, suppressed, and eliminated throughout Florida; (2) Relevant Cellular Devices prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Relevant Cellular Devices.  During the Class Period, Qualcomm's illegal conduct substantially affected Florida commerce and consumers.  As a direct and proximate result of Qualcomm's unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury.  Qualcomm has engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. § 501.201, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

148.   **Illinois**: Qualcomm's monopolization and anticompetitive conduct has restrained trade in violation of the Illinois Antitrust Act (740 Illinois Compiled Statutes 10/1, *et seq.*). During the Class Period, Qualcomm's illegal conduct substantially affected Illinois commerce. As a direct and proximate result of Qualcomm's unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with

1  further injury. By reason of the foregoing, Qualcomm has monopolized in restraint of trade in

2  violation of the Illinois Antitrust Act (740 Illinois Compiled Statutes 10/1, *et seq.*). Accordingly,

3  Plaintiffs and members of the Damages Class seek all forms of relief available under District of

4  the Illinois Antitrust Act (740 Illinois Compiled Statutes 10/1, *et seq.*).

5      149.    Qualcomm established on unlawful scheme by which it acquired and maintained

6  monopoly power in the Modem Chipset Market and SEP Licensing Market through

7  anticompetitive means, including by excluding competition.

8      150.    As a result of Qualcomm's unlawful conduct, Plaintiffs and the Class were

9  overcharged when they purchased their relevant cellular devices.  This is of the type of injury

10  that the aforesaid antitrust laws of the above identified status were designed and intended to

11  prevent.

12      151.    In addition, Defendant has profited significantly from the aforesaid

13  monopolization. Defendant's profits derived from its anticompetitive conduct come at the

14  expense and detriment of Plaintiffs and members of the Damages Class.

15      152.    Accordingly, Plaintiffs and members of the Damages Class in each of the above

16  jurisdictions seek damages (including statutory damages where applicable), to be trebled or

17  otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit,

18  including reasonable attorneys' fees, to the extent permitted by the above state laws.

19

20

21                  **FIFTH CLAIM OF RELIEF**
                  **(Unjust Enrichment)**

22      153.    Plaintiffs repeat the allegations set forth above as if fully set forth herein.

23      154.    As a result of its unlawful conduct described above, Defendant Qualcomm has

24  and will continue to be unjustly enriched. Defendant has been unjustly enriched by the receipt

25  of, at a minimum, unlawfully inflated prices and unlawful profits related to the relevant cellular

26  devices.

27      155.    Defendant has benefited from its unlawful acts and it would be inequitable for it

28  to be permitted to retain any of the ill-gotten gains resulting from its unlawful practices and the

39

1    overpayments made by Plaintiffs and members of the Damages Class for relevant cellular

2    devices during the Class Period.

3        156.    Plaintiffs and members of the Damages Class are entitled to the amount of

4    Defendant's ill-gotten gains resulting from its unlawful, unjust, and inequitable conduct.

5    Plaintiffs and members of the Damages Class are entitled to the establishment of a constructive

6    trust consisting of all ill-gotten gains from which Plaintiffs and members of the Damages Class

7    may make claims on a pro rata basis.

8

9    **IX.    PRAYER FOR RELIEF**

10       **WHEREFORE**, Plaintiffs demand judgment that:

11       157.    This action may be maintained as a class action under Rule 23(a), (b)(2) and

12   (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as

13   provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every

14   member of the Class;

15       158.    The unlawful conduct alleged herein constituted a violation of Sections 2 and

16   3(b) of the Sherman Act, and the state antitrust and consumer protection laws set forth herein;

17       159.    Plaintiffs and members of the Damages Class recover damages, to the maximum

18   extent allowed under such state antitrust and consumer protection laws, and that a joint and

19   several judgment in favor of Plaintiffs and members of the Damages Class be entered against

20   Defendant Qualcomm in an amount to be trebled to the extent such laws permit;

21       160.    Plaintiffs and members of the Damages Class recover damages, to the maximum

22   extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully

23   gained from them;

24       161.    Defendant, its affiliates, successors, transferees, assignees and other officers,

25   directors, partners, agents and employees thereof, and all other persons acting or claiming to act

26   on their behalf or in concert with them, be permanently enjoined and restrained from in any

27   manner continuing, maintaining or renewing the conduct alleged herein, or from committing

28

40

COMPLAINT

1    any other conduct having a similar purpose or effect, and from adopting or following any

2    practice, plan, program, or device having a similar purpose or effect;

3         162.    Plaintiffs and members of the Damages Class be awarded restitution, including

4    disgorgement of profits Defendant obtained as a result of their acts of unfair competition and

5    acts of unjust enrichment;

6         163.    Plaintiffs and members of the Classes be awarded pre- and post-judgment

7    interest as provided by law, and that such interest be awarded at the highest legal rate from and

8    after the date of service of this Complaint;

9         164.    Plaintiffs and members of the Classes recover their costs of suit, including

10   reasonable attorneys' fees, as provided by law; and

11        165.    Plaintiffs and members of the Classes have such other and further relief as the

12   case may require and the Court may deem just and proper.

13   **X.     DEMAND FOR TRIAL BY JURY**

14

15        166.    Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand trial by jury of all issues so

     triable under the law.

16
     DATED:  February 15, 2017                 **BARRACK, RODOS & BACINE**

17
                                               */s/ Stephen R. Basser*
18                                             STEPHEN R. BASSER (121590)

19                                             sbasser@barrack.com
                                               SAMUEL M. WARD (216562)
20                                             sward@barrack.com
                                               600 West Broadway, Suite 900
21                                             San Diego, CA  92101
                                               Telephone:  (619) 230-0800
22
                                               **BARRACK, RODOS & BACINE**
23                                             JEFFREY B. GITTLEMAN
                                               *(pro hac vice to be filed)*
24                                             jgittleman@barrack.com
                                               Two Commerce Square
25                                             2001 Market Street, Suite 3300
                                               Philadelphia, PA  19103
26                                             Telephone:  (215) 963-0600

27

28
     COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EMERSON SCOTT, LLP**
JOHN EMERSON *(pro hac vice to be filed)*
830 Apollo Lane
Houston, Texas 77058
Telephone:  (281) 488-8854

**EMERSON SCOTT, LLP**
DAVID G. SCOTT
The Rozelle-Murphy House
1301 Scott St.
Little Rock, AR 72202
Telephone:  (501) 907-2555

Attorneys for Plaintiffs

42

COMPLAINT